BRYANT, Appellant, vs. BANK OF COMMERCE, Respondent.

*February 24 — March 16, 1897.*

*Special agency: Delegation of power.*

A committee appointed by the directors of a bank from their number, and authorized by them to purchase certain lots for the bank on such terms as should seem to them most advantageous to it at a price not exceeding a sum named, is a special agent and must act within the special authority given; and it has no power to bind the bank to pay a larger sum for those lots than the price fixed by the board, or to give in addition another parcel of land; much less have the president and cashier of the bank, either as members of the committee or by virtue of their offices, power to delegate such authority and discretion to a third person and bind the bank to pay him a commission for his services.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Affirmed.*

The case is fully stated in the opinion.

For the appellant there was a brief by *Knowles, Dickinson, Buchanan, Graham & Wilson*, and oral argument by *S. N. Dickinson.*

For the respondent there was a brief by *Catlin, Butler & Lyons*, and oral argument by *T. E. Lyons.*

CASSODAY, C. J.   This action is brought by the plaintiff to recover the amount of his commission for negotiating for the purchase from one Henry W. McNabb of the three lots

described. The plaintiff claims that he made a contract with McNabb for the purchase of such lots for $38,250 in cash, and lot 24 and five feet off the north side of lot 25 in another block; that it was agreed and understood that he was to have, as his commission for such purchase, all of the rents accruing and due from the tenants occupying said lots, and the buildings thereon, from the time of such purchase, for the months of March and April, 1893, and that he was also to have, as and for a part of his commission, the several buildings upon said lots, which he was to remove; that the rents for those two months amounted to $710, and that the buildings thereon were reasonably worth $2,250, amounting in the aggregate to $2,960. The defendant, by way of answering, admitted that it was a corporation, as alleged, but denied each and every other allegation of the complaint.

It appears from the evidence, among other things, that at a meeting of the board of directors of the defendant, January 20, 1893, Beebe, Johnson, Reed, Buxton, Brooks, and Butler being present, certain preambles and resolution were adopted, to the effect that it was desirable that the bank be removed as soon as possible into more suitable quarters, and it had been proposed that a separate corporation be formed for the purpose of procuring a site on Tower avenue and erecting a block thereon to be used by the bank and for other purposes, the bank to have an interest in said corporation, and that the southwest corner of North Seventh street, known as the "Agen Corner," could be purchased for $35,000, and the southeast corner of the same street, known as the "McNabb Corner," could be purchased for $35,000, and it was best that one or the other of said corners be purchased for the purpose aforesaid: Therefore be it "resolved, that the president, cashier, and gentlemen Reed and Beebe, constitute a committee to treat with the owners of said corners, and they are hereby authorized

to purchase one of the same upon such terms as shall seem to them most advantageous for the bank, the price to be given for the corner selected not to exceed the price of $35,000."

It is also claimed on the part of the plaintiff that there is evidence to the effect that Brooks was the cashier, and Buxton president, of the defendant bank at the time the deal was made, and that Reed, Beebe, Brooks, and Buxton were also directors; that Brooks, on behalf of the committee, had most of the conversation with the plaintiff by which he was authorized to make the deal for the defendant; that Brooks acted under authority given by the board of directors in the resolution, and also as a director and cashier of the bank; that the terms of purchase were agreed to between McNabb and the plaintiff, acting for the bank, and subsequently that that agreement was ratified by Buxton and Brooks, of the committee referred to; that such agreement was concluded February 28, 1893; that McNabb was always ready and willing to carry out the agreement; that Brooks, McNabb, and the plaintiff talked the matter over at the bank; that *Bryant* said in the presence of Brooks that the deal had been made; that *Bryant* showed Brooks a paper, and asked him if he could publish that in the evening paper; that Brooks consented to its publication; that that article was to the effect that the deal which had been pending for some time between the bank and Mc-Nabb was that day concluded; that the bank had bought the seventy-five feet front at the southeast corner of Tower avenue and Seventh street, where it would erect, in the early spring, a handsome five-story brick structure, the price paid being $50,000, or $666 a front foot, and that *Bryant* made the deal; that much of the conversation in reference to the terms of the deal that was had with Brooks was in the presence of Buxton, who had directed the plaintiff to go and talk the matter over with Brooks, and that whatever Brooks

agreed to would be all right; that the plaintiff informed Brooks that McNabb had consented to take $38,250 in cash and the real estate hereinbefore mentioned, in the presence of Buxton, and he nodded assent to the terms; that the terms so assented to were to the effect that McNabb was to receive $38,250, and lot 24 on Tower avenue, and five feet off the adjoining lot 25, making thirty feet, free and clear of all incumbrances, and the bank to receive those three lots on the corner of Tower avenue and Seventh street, and that the buildings were to go to the plaintiff for his commission, and also the rent from that time on, and they said, " All right;" that the plaintiff then wrote the notice so published in the evening paper, and read it to Buxton and Brooks, and they said it was all right; that the plaintiff and McNabb then arranged to deliver possession, and informed Brooks and Buxton that they were ready to do so; that Brooks said, " That's good," and then spoke to Buxton, and said, " Come in at 3 o'clock in the afternoon;" that at the time mentioned the plaintiff and McNabb went into the bank, and Brooks told them to come in the next day; that they went in the next day, but Buxton would not say one thing or another; that Brooks said, "All right," but he was busy and put the plaintiff off; that a few days afterwards Buxton said that there was a good deal of doubt about the trade going through; that the plaintiff soon after told Brooks he wanted his commission; that Brooks then told him to keep cool, and he would see; that the defendant refused to pay such commission, and hence this suit.

Upon such testimony the trial court granted a nonsuit, and from the judgment entered thereon the plaintiff brings this appeal.

Counsel for the defendant contend that the nonsuit was properly granted upon several grounds; but, as stated by the counsel for the plaintiff, " they are practically covered by the ground that there was no evidence to show that the

plaintiff was authorized by the bank to act for it in making the deal." As indicated, the defendant's board of directors appointed a committee, consisting of four of their number, to treat with the owners of the Agen lots, on one corner, or the McNabb lots, on the other corner, with authority to purchase the two lots on either corner upon such terms as to them seemed most advantageous for the bank, at a price not to exceed $35,000. The "terms" and the "price," within the limitation named, as well as the location, either upon the one corner or the other, were thus left to the judgment and discretion of the committee thus appointed. There is no evidence that two of the committee — Reed and Beebe — or either of them, ever took part in, or was present during, any of the negotiations leading to or agreeing upon the terms of the alleged deal. All conversations of the plaintiff and McNabb in respect to the matter appear to have been with Brooks, the cashier, although some of such conversations, as indicated, were in the presence or hearing of Buxton, the president. There is no ground for claiming that the plaintiff had any authority to act for the defendant in making such purchase, except such authority as he received from Brooks, with the acquiescence of Buxton, in such conversations. By the resolution, the whole committee was not authorized to buy the three lots at $38,250, and give in addition another piece of land having thirty feet front. Much less did the resolution authorize one half of the committee to delegate to the plaintiff the power and authority to exercise such judgment and discretion, and to bind the defendant to pay the plaintiff therefor a commission of $2,960. Besides, the transaction was not within the scope of the ordinary business of the bank, nor incident to such business, but involved the exercise of power given specially by statute for a specific purpose and with prohibitory restrictions. R. S. sec. 2024, subsec. 29, p. 603. It follows that Brooks, as cashier, and Buxton, as president, had no power to delegate such

authority to the plaintiff by virtue of their respective offices. On the contrary, their only authority to act in the matter at all was by virtue of the resolution. These things being so, there was no implied authority in Brooks and Buxton, or either of them, to appoint the plaintiff as agent of the bank to make such purchase. Morawetz, Priv. Corp. § 536. It is there said that " the authority of the directors of a corporation to appoint inferior agents, with power to represent the company, can be implied only where such appointment would be a reasonable measure in carrying on the company's business in the ordinary manner. Those powers of the directors of a corporation which it is intended they should exercise personally can in no case be delegated. The general supervision and direction of the affairs of a corporation are especially intrusted by the shareholders to the board of directors. It is upon the personal care and attention of the directors that the shareholders depend for the success of their enterprise. It follows that authority to delegate these general powers of management cannot be implied."

Counsel for the plaintiff contend that the question is not what power the plaintiff in fact possessed, but what were his apparent powers; that is to say, what powers had Mc-Nabb a right to believe he possessed. While a general agent may bind his principal when acting within the scope of his apparent authority, although he exceeds his specific instructions, yet that is not the rule in the case of a special agent. *Kelly v. Strong's Estate*, 68 Wis. 156; *Hand v. Conger*, 71 Wis. 292; Mechem, Agency, §§ 283–285. "A special agent is one authorized to act only in a specific transaction." Id. § 6. The committee appointed by the resolution was a special agent, and certainly the plaintiff cannot be regarded as anything more. As indicated in the authorities cited: " Where the agency is a special and temporary one, the authority must be strictly pursued, and the principal is not bound if the agent exceeds his authority." 1 Am. & Eng.

Ency. of Law (2d ed.), 993. We must hold that Brooks and Buxton had no power, for and in behalf of the defendant, to employ the plaintiff to make the alleged purchase, and that the plaintiff never was employed to make such purchase by the defendant.

*By the Court.*— The judgment of the superior court of Douglas county is affirmed.